# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 96-20667
_____

ELVIS E. JOHNSON,

Plaintiff-Appellee,

versus

ROBERT C. SAWYER, *et al.*,

Defendants,

ROBERT C. SAWYER, *et al.*,

Defendants-Appellants.

_____

### Appeals from the United States District Court
### for the Southern District of Texas
_____

August 21, 1997

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Of the numerous issues raised in this appeal, two are critical to our disposition: whether tax return information, once disclosed in open court, loses its confidentiality such that its subsequent publication by a federal employee does not violate 26 U.S.C. § 6103, which prohibits disclosure of such information except under limited, non-applicable, circumstances; and whether, on remand, this case must be reassigned.

For the second time, our court reviews a judgment in favor of Elvis E. Johnson for the claimed wrongful disclosure of tax return information in two 1981 press releases issued by the Internal Revenue Service following his guilty plea to, and conviction for, income tax evasion. In 1995, our en banc court reversed Johnson's $10 million Federal Tort Claims Act judgment against the United

States and remanded for dismissal of that claim. ***Johnson v. Sawyer***, 47 F.3d 716, 737-38 (5th Cir. 1995) (en banc). Johnson then proceeded against IRS officers (Appellants) responsible for the releases. Based partly on an instruction that the releases wrongfully disclosed tax return information, the jury awarded Johnson $9 million. Because that instruction was erroneous in part and affected the outcome of this case, we **VACATE** and **REMAND** for a new trial. And, to ensure, *inter alia*, the appearance of impartiality, the case is to be **REASSIGNED**.

                                    I.

In 1981, Johnson was an executive with American National Insurance Company (ANICO) and was employed at its headquarters in Galveston, Texas. Johnson began in 1951 with ANICO as an agent in Springfield, Missouri. Because of his success, he was transferred to Galveston in 1971. By 1976, he had become executive vice-president and a member of the board of directors. He and Orson Clay, ANICO's president, reported directly to the board. In an intra-company circular, Clay described Johnson as "the most successful field man and home office executive in [ANICO's] history".

In 1976, the IRS began auditing ANICO and its key executives, including Johnson and his wife. Upon discovering discrepancies, the examining agent referred the matter to the IRS Criminal Investigation Division (CID), which assigned the case to appellant Robert G. Stone, a Special Agent with the CID.

Following an investigation, the CID referred the case to the Department of Justice to prosecute Johnson and his wife for tax evasion for the years 1974 and 1975. The case was assigned to Assistant United States Attorney James L. Powers. In February 1981, Powers advised Johnson's attorney, Robert I. White, that he planned to seek an indictment of both Johnson and his wife; but, if Johnson pled guilty to a one-count criminal information that he underpaid his 1975 taxes (by approximately $3,500), the Government would not prosecute his wife for either 1974 or 1975, would not prosecute Johnson for 1974, and would recommend a probated sentence.

According to Johnson, he kept ANICO's executive committee, president (Clay), and counsel fully apprised of the situation. Evidently, White and Johnson were reassured that, even if Johnson pled guilty to a crime, as long as there was no publicity that would embarrass ANICO, Johnson could continue with ANICO as executive vice-president. White therefore determined to ensure that Johnson's identity would never be disclosed — that if someone looked at the district court file, he could not associate Johnson with ANICO.

White notified Powers that publicity of a conviction would be extremely damaging, and Powers evidently agreed, as he had with White on other occasions for other defendants, to preserve Johnson's relative anonymity. Powers agreed to let White seek the district court's authorization to have the presentence investigation performed before charges were filed. The completed

- 3 -

presentence investigation report was delivered to the court on 2 April 1981. Johnson's case was to be heard on Friday, 10 April, at 4:00 p.m. in the Galveston courthouse. White requested that the criminal information be filed at the time of the hearing, along with Johnson's waiver of indictment and the plea bargain agreement; and that the "Defendant's Information" sheet give White's office address for Johnson's address. Powers agreed to these precautions and agreed that no press release would be issued concerning Johnson. But, Powers did not advise the IRS of this "no publicity" agreement.

At approximately 4:00 p.m. on 10 April, proceedings on the record commenced. White had ensured that the district judge (Judge Gibson) had no other business that Friday afternoon, and Powers had agreed to that time to minimize the risk of publicity. White and Johnson searched the Galveston courthouse for members of the press and found none, so the only people present for the hearing were Johnson, White, Powers, the district judge, and court personnel. Johnson signed and filed a waiver of indictment.

The "Defendant Information" sheet, identifying Johnson as "Elvis Johnson" of "1100 Milam St., 28th Floor, Houston, Texas 77002", was also filed. In fact, although Johnson's full name is Elvis E. Johnson, he was known as "Johnny" Johnson by friends, ANICO executives and employees, and business acquaintances; he signed all correspondence as "Johnny". In addition, Johnson's home address was 25 Adler Circle, in Galveston.

A criminal information, charging Johnson with tax evasion for 1975 in the amount of $3,474.97, was filed; and he signed and swore to a written "Plea of Guilty".  After a FED. R. CRIM. P. 11 hearing, the court sentenced Johnson to six months confinement, suspended, and one-year of supervised probation. None of the documents filed on 10 April mentioned Johnson's employment.  (As discussed *infra*, properly excluded from evidence was the transcript of the plea hearing; it reflects that the district judge did make reference to Johnson being "an executive with American National Insurance Company".)  The following Monday, 13 April, a judgment of conviction and sentence was filed.

According to Johnson, when returning from court on 10 April, he notified ANICO's president (Clay) about what transpired, and Clay responded favorably that the IRS matter was over and that he (Johnson) should move forward because he was important to ANICO. By the end of business on Tuesday, 14 April, Johnson informed other members of ANICO's executive committee that he had pled guilty to a tax crime and put the matter behind him.  Johnson testified that he was not asked to resign; instead, he was told the "best interest of the company is served by keeping you exactly where you are".

The day before, however, Monday, 13 April, appellant Sally Sassen, an IRS Public Affairs Officer, had prepared the following press release about Johnson's conviction, entitled "Insurance Executive Pleads Guilty in Tax Case":

> GALVESTON, TEXAS--In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion.  Judge Hugh Gibson sentenced Johnson,

- 5 -

of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.

Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest.

Sassen had prepared the release with the help of Special Agent Stone, relying, with one exception (the paragraph regarding back taxes, penalties and interest), solely on information she received from him. She testified that she did not ask Stone about the source of that information, although she knew Stone had not been in the courtroom for Johnson's hearing on 10 April. As noted, the last paragraph of the release (penalty portion) was not based on information received from Stone. It was boilerplate language in the form Sassen used.

According to Stone, he learned of the conviction from Powers on either Friday, 10 April, or Monday, 13 April. Stone testified that, based on that conversation, he prepared on Monday, 13 April, the following internal "Report of Legal Action":

On [10 April 1981] AUSA JIM POWERS filed a criminal information charging JOHNSON with tax evasion under 26 USC 7201 for the years 1974 and 1975. JOHNSON plead [sic] guilty on the same day to one count of 7201 for 1975 and the 1974 count was dismissed. Judge GIBSON sentenced JOHNSON to 6 months to serve with this 6 months being suspended and placed him on 1 years supervised preparation [sic]. No fine was assessed and no appeal is expected. This legal action occurred in Galveston.

In addition to not attending Johnson's hearing, neither Sassen nor Stone had any of the court documents. Stone, who was in Houston, was not advised by Powers about either the plea agreement or hearing in Galveston until approximately two hours before the hearing, when Powers was leaving his Houston office to travel to Galveston for the hearing. Because of such short notice, another matter prevented Stone from attending the hearing. Stone, however, did not check the public record before giving the information to Sassen.

Sassen prepared the release in conformance with a District Director's Memorandum (DDM), directing her, following guilty pleas, to prepare press releases based on information furnished by the investigating special agent (Stone). Pursuant to the DDM, Stone was to provide the taxpayer's age, occupation, home address, and other facts to the Public Affairs Officer (Sassen) and was to obtain the information from the IRS investigatory file for that taxpayer. The DDM did not require inquiry as to whether information taken from the file had been disclosed in the criminal proceeding. The DDM did, however, state that "[t]he DPAO [Sassen] will coordinate all CID releases with the Branch Chief, Criminal Investigation Division, and the prosecuting U.S. Attorney".

After preparing a draft of the release, Sassen telephoned Stone and read it to him (this was pre-FAX). Stone testified that he copied it verbatim. According to Stone, he telephoned Powers and read the release to him; but, Powers testified that he remembered neither this telephone call nor basically anything else

about the case. Stone then contacted Sassen and told her that Powers had approved the release.

Sassen also called appellant Michael Orth, a CID supervisory employee, and read the release to him. IRS procedures then in effect (1981) required that such releases be cleared at the supervisory level. After Orth approved the release, Sassen mailed it on 13 April to 21 media outlets in the Galveston area.

On 15 April, a Galveston journalist telephoned ANICO to inquire about Johnson's conviction. Johnson learned of the press release and contacted White, who immediately contacted Powers. In a telephone conversation surreptitiously recorded by White, Powers denied any knowledge of the release and assumed the IRS was responsible. Powers told White, "If they damaged your client in some way, sue the hell out of them as far as I'm concerned".

White also telephoned and wrote to the IRS about the release. Among others, he spoke with appellant Dale V. Braun, who was Acting District Director of the IRS Austin, Texas, District on that day (15 April). It was then that the IRS realized that the release contained erroneous information: that Johnson had been charged only for 1975; and that the criminal information did not charge him with claiming false business deductions or altering documents.

Braun contacted appellant Robert C. Sawyer, the Chief of the CID in the Austin District, and Harold Friedman, the IRS Austin District Counsel, and all agreed to withdraw the release. Sassen informed the media outlets that the release might contain errors and asked that it not be publicized.

The IRS then obtained a copy of the criminal information to which Johnson had pled guilty and, following discussion on 16 April among Sawyer, Sassen, Orth, Braun, and other IRS personnel, decided to issue a revised release. IRS Counsel Friedman strongly advised against issuing a second release because it would only compound their potential liability. The revised release was identical to the 13 April release, except for the following italicized portion of the second (middle) paragraph:

> Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with *willful evasion of federal tax by filing a false and fraudulent tax return for 1975*.

(Emphasis added.)

Powers evidently participated in the process resulting in this second release. An IRS special agent testified that, on 16 April, as instructed by Orth, he took a copy of the proposed revised release to Powers, who was participating in a trial; that, during a recess, he gave it to Powers for his review and approval; and that Powers approved it. Consistent with his other testimony, Powers did not recall the incident; he only recalled

> discussing this issue with some lawyer some years ago about a correction of the press release. I don't remember a second press release. Maybe there was one.

The IRS special agent then gave the proposed release to a secretary with the comment that "Powers said this was okay"; the secretary relayed that information to the Austin office. This second release was issued on 17 April to the 21 media outlets that received the first.

- 9 -

According to Johnson, he informed ANICO president Clay and two executive committee board members of the first release on 15 April and provided Clay with a copy of the release that same day. On learning from White that the IRS would not withdraw the 13 April release and planned to issue a second, Johnson told Clay that all ANICO board members should be informed. Clay advised Johnson that he (Clay) would contact the entire board. On Saturday, 18 April, and Monday, 20 April, Clay asked Johnson to resign from his positions as executive vice-president and board member.

On the one hand, Clay testified that he was unaware of the press release when he asked Johnson for his resignation. According to Clay, the ANICO board decided that someone with a felony conviction could not hold a high position within the corporation. But, Johnson presented evidence that the "real problem" was the publicity surrounding his conviction, not the fact of the conviction. (Obviously, the jury accepted Johnson's version.) Johnson resigned on 20 April 1981.

Johnson was reassigned to ANICO's office in Springfield, Missouri (where he began in 1951), as an associate regional director. He served there at considerably diminished compensation until 1986, when he reached the mandatory retirement age (65). He then worked for ANICO as an agent, his starting position with it.

In 1983, Johnson filed this action against Sawyer, Braun, Sassen, and other IRS employees for wrongful disclosure of tax return information, in violation of 26 U.S.C. § 6103. That section provides:

**(a) General Rule.**—Returns and return information shall be confidential, and except as authorized by this title—

**(1)** no officer or employee of the United States,

...

shall disclose any *return or return information* obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section....

**(b) Definitions.**—For purposes of this section—

...

**(2) Return information.**—The term "return information" means—

**(A)** *a taxpayer's identity*, the nature, *source*, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, *tax liability*, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense....

*Id.* § 6103(a)(1),(b)(2)(A) (emphasis added).

Johnson sought recovery under 26 U.S.C. § 7217(a), which permits an action for damages against "any person" who knowingly or negligently discloses a return or return information (collectively, "tax return information") in violation of § 6103. No liability attaches if the disclosure "result[ed] from a good faith, but

- 11 -

erroneous, interpretation of section 6103". *Id*. § 7217(b). Section 7217 was repealed in 1982 and replaced by § 7431, which permits an action against the United States for damages for disclosure by a federal employee in violation of § 6103. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 357, 1982 U.S.C.C.A.N. (96 Stat.) 324, 645-46. The legislation provided that "amendments made by this section shall apply with respect to disclosures made after the date of enactment of this Act [September 3, 1982]." *Id.* § 357(c), 1982 U.S.C.C.A.N. at 646. Because the disclosures at issue took place in 1981, this action is governed by § 7217, not § 7431.

Pursuant to § 7217, a plaintiff is entitled to his actual damages sustained as a result of an unauthorized disclosure (including punitive damages for willful or grossly negligent disclosures) or to liquidated damages of $1,000 per such disclosure, whichever is greater, as well as the costs of the action. 26 U.S.C. § 7217(c). It bears repeating that an individual who discloses as the result of a "good faith, but erroneous, interpretation" of § 6103 cannot incur liability. *Id.* § 7217(b).

Initially, Johnson claimed wrongful disclosure for four items of tax return information: age; home address; that he was charged with false business deductions and altering documents on his 1974 and 1975 returns; and that he would be required to pay back taxes, plus penalties and interest.

Johnson amended his complaint later in 1983, adding a claim against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346, 2671-2680, for negligent supervision. The United States and the individual defendants moved to dismiss or for summary judgment. The motions were denied without a written opinion.

Johnson filed a second amended complaint in 1984, adding Stone and Orth as defendants. He also claimed that a fifth item of tax return information had been disclosed in the releases: that he was executive vice-president of ANICO. The defendants again moved to dismiss or for summary judgment on a variety of grounds, including that, as a matter of law, *none* of the information contained in the releases had been disclosed in violation of § 6103. Similarly, Johnson moved for partial summary judgment, claiming, *inter alia*, that the releases, as a matter of law, wrongfully disclosed tax return information.

In 1986, the district court ( Chief Judge Singleton) ruled on the cross-motions, concluding that, as a matter of law, "issuing the [releases] violated § 6103". **Johnson v. Sawyer**, 640 F. Supp. 1126, 1133 (S.D. Tex. 1986). The court determined that the releases "disclosed" tax return information within the meaning of § 6103 and that none of the statutory exceptions to the rule against disclosure applied. **Id.** at 1131-32 & n.16.

Along a similar line, the Appellants had urged the court to create a judicial exception for disclosure of material in which Johnson "had no reasonable expectation of privacy ... because those

items were incidental to information already in the public record". *Id.* at 1132. The court rejected that suggestion, explaining that "Congress made the language of § 6103 quite clear: any disclosure of return information is illegal 'except as authorized *by this title*'". *Id.* (quoting § 6103(a))(emphasis added by district court).

Consequently, Johnson's motion for partial summary judgment was granted on that issue. *Id.* at 1139. The court also denied Appellants' motion for summary judgment on the following issues: that no individual Appellant other than Sassen could be held liable under § 7217; that Appellants evidenced sufficient good faith to preclude liability under § 7217; and that suit against Orth and Stone was time-barred.

The claims against the individual defendants were severed, and a bench trial was held on the FTCA claim in 1990. Johnson was awarded approximately $10 million. *Johnson*, 760 F. Supp. 1216, 1233 (S.D. Tex. 1991). Initially, our court affirmed the judgment, *Johnson v. Sawyer*, 980 F.2d 1490 (5th Cir. 1992) and 4 F.3d 369 (5th Cir. 1993), but our en banc court reversed and remanded with directions to dismiss the FTCA claim. *Johnson*, 47 F.3d at 738.

While the case was on appeal, Chief Judge Singleton retired. The case was reassigned to Judge Hoyt. On remand, Johnson filed a third amended complaint, discarding the FTCA claim and adding a claim that "identifying" him constituted a sixth item of wrongful disclosure.

A hotly, if not bitterly, contested jury trial was held in 1996. The jury found for Johnson, awarding $6 million in actual, and $3 million in punitive, damages. The court awarded pre-judgment interest at 6% per annum on $6 million commencing 4 August 1986, post-judgment interest on all sums awarded at 5.6% per annum, attorneys' fees of $1.2 million (20% of $6 million), and costs of approximately $54,000.

## II.

Appellants present a number of issues: that several jury instructions are erroneous, including not instructing (1) that the portions of the releases concerning the charges and penalties were not tax return information and (2) that only Sassen can be liable under § 7217 for a § 6103 violation; that Johnson's claims against Stone and Orth are time-barred; and that many evidentiary rulings (including the exclusion of Johnson's guilty plea hearing transcript) and the awards for punitive damages, pre-judgment interest, and attorneys' fees are erroneous. Moreover, should a remand be necessary, they request that we exercise our supervisory powers and reassign the case because "there are serious reasons to question the trial judge's appearance of impartiality".

As is often the case, what is *not* in issue is as important, if not more so, than what is. For example, Appellants do not challenge the sufficiency of the evidence either (1) as to causation for liability under § 7217, or (2) as to the "negligently or knowingly ... disclosing or permitting the disclosure of tax return information" standard in an instruction challenged by all

Appellants but Sassen.  And, because we reverse and remand for a new trial, we necessarily do not reach the issues as to punitive damages, pre-judgment interest, and attorneys' fees.  Moreover, we only describe, rather than decide, most of the challenges to instructions and evidentiary rulings.  We describe them simply to assist the district court in deciding what is not law of the case.  On remand, both § 7217 liability and damages are in issue, as are, of course, the issues we do not decide in this opinion.

A.

We rule on only two of the six challenged instructions.  The issues concerning the balance are reserved for the district court on remand.  Our standard of review for such claims is well-settled:

> First, the challenger must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."  [**Bender v. Brumley**, 1 F.3d 271, 276 (5th Cir. 1993)].  Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. [**Id.** at 1276-77.]

**FDIC v. Mijalis**, 15 F.3d 1314, 1318 (5th Cir. 1994); *see also* **Davis v. Ector County, Tex.**, 40 F.3d 777, 786 (5th Cir. 1994).  In addition, to the extent there is claimed error in refusing to give an instruction, the challenger must show "[a]s a threshold matter ... that [his] proposed instruction correctly states the law".  **FDIC v. Henderson**, 61 F.3d 421, 425 (5th Cir. 1995).

1.

Pursuant to the 1986 summary judgment ruling, the district court instructed the jury that, "as a matter of law the April, 1981 news releases ... did disclose tax return information in violation of the law". Appellants claim reversible error: that the 13 April release contained, at most, only three items of confidential return information (Johnson's age, his address, and the word "vice-president"); and that, therefore, the jury should have been asked to decide "whether disclosure of these altogether routine items caused Johnson to lose his job". Appellants maintain that, as a matter of law, those items could not. They ask us to reverse and render or, in the alternative, remand and reassign the case for a new trial.

a.

Although we ultimately conclude that the district court did reversibly err in giving this part of the instruction, we must first explain why the procedural posture of this case makes it impossible to render judgment for Appellants.

Appellants assert that "their summary judgment motion should have been granted in 1986". Their request that we review and reverse the 1986 order is buried in their brief in the last paragraph of the section discussing the liability instruction, without supporting argument, authority, or citations to the record. We have held repeatedly that we will not consider issues not briefed by the parties. *See* **Webb v. Investacorp, Inc.**, 89 F.3d 252, 257 n.2 (5th Cir. 1996) ("An appellant abandons all issues not

raised and argued in its *initial* brief on appeal.") (quoting ***Cinel v. Connick***, 15 F.3d 1338, 1345 (5th Cir. 1994)); ***McKethan v. Texas Farm Bureau***, 996 F.2d 734, 739 n.9 (5th Cir. 1994) (failure to sufficiently brief issue constitutes waiver of issue).

In any event, even if this issue had been properly presented, Appellants would face other problems. They contend that the district court erred in *denying* their summary judgment motion in 1986. Appellants advance this contention despite the fact that the instruction in issue was based on the 1986 *grant* of *Johnson's motion* for partial summary judgment. We have held repeatedly that orders denying summary judgment are not reviewable on appeal where final judgment adverse to the movant is rendered on the basis of a subsequent full trial on the merits. *See* ***Black v. J.I. Case Co.***, 22 F.3d 568, 570-72 (5th Cir. 1994); ***Wells v. Hico ISD***, 736 F.2d 243, 251 n.9 (5th Cir. 1984). Because Appellants lost at trial, we cannot review the *denial* of their summary judgment motion.

On the other hand, when, by summary judgment or some other ruling, an issue is removed from those to be tried, that ruling can be contested on appeal, assuming it was otherwise properly preserved in the district court, including possibly being presented again during trial. *E.g.*, ***United States v. Graves***, 5 F.3d 1546, 1551 (5th Cir. 1993) (requiring party who unsuccessfully opposed motion *in limine* to lodge contemporaneous objection at trial to preserve issue for appeal); ***United States v. Estes***, 994 F.2d 147, 149 (5th Cir. 1993) (per curiam) (same). But, again, Appellants challenge the *denial* of their motion, *not the grant* of Johnson's.

This is not a distinction without a difference. Obvious evidentiary considerations come into play, that we need not elaborate on for purposes of this opinion.

More importantly, even if Appellants could raise this issue, their position on appeal is different from the one they took in 1986. They contend now that the three items of return information they now concede were disclosed in violation of § 6103 could not, as a matter of law, have caused Johnson's resignation. But, in 1986, they did not raise lack of causation as a basis for summary judgment. Instead, they asserted that "none of the information in the press release was tax ... return information that could not lawfully be disclosed under the circumstances of this case" — *i.e.*, that nothing in the release violated § 6103. Obviously, these contentions are not even similar: one, made in district court, denies that a violation of § 6103 has occurred; the other, made here, presumes that one has.

Although we can affirm a summary judgment on grounds not relied on by the district court, those grounds must at least have been proposed or asserted in that court by the movant. *See Missouri Pac. R.R. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 538 (5th Cir. 1994) ("[W]e can affirm the district court on the alternate grounds *asserted below*.") (emphasis added); *FDIC v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991) (refusing to affirm summary judgment on grounds "neither raised below ... nor even raised *sua sponte* by the district court"); *Frank C. Bailey Enter., Inc. v. Cargill, Inc.*, 582 F.2d 333, 334 (5th Cir. 1978). More

importantly, we have held that, on appeal, we will not consider a new ground in opposition to, or in defense of, summary judgment. *See Laguarta*, 939 F.2d at 1240. Thus, even were we to actually review the denial of Appellants' motion, lack of causation would be a new ground on appeal, one not raised in district court (in 1986).

Of course, we could address the causation issue in the context of a sufficiency challenge; but, as noted, it has not been presented to us. Appellants did make Rule 50 motions at the appropriate times during the trial on several grounds, including lack of causation. However, they do not ask us to review the denial of those motions or conduct a sufficiency review of the evidence. Once again, Appellants' failure to raise this issue constitutes waiver and abandonment on appeal. *See Webb*, 89 F.3d at 257 n.2; *McKethan*, 996 F.2d at 739 n.9.

### b.

Because Appellants contend that the challenged instruction failed to distinguish between information in the releases that *was* wrongfully disclosed and information that *was not* wrongfully disclosed, we must first determine the § 6103 violation in the releases. This requires us to answer a question explicitly left open in our en banc opinion — namely, "whether to follow the rule of *Lampert v. United States*, 854 F.2d 335, 338 (9th Cir. 1988), that section 6103(a) does not bar disclosure of matters of public record". *Johnson*, 47 F.3d at 737 n.46.

i.

Section 6103 establishes a general, salutary rule that "returns" and "return information" shall be confidential. ***Church of Scientology v. I.R.S.***, 484 U.S. 9, 10 (1987). Disclosure by a government employee is prohibited unless a specific statutory exception provides for it. 26 U.S.C. § 6103 (forbidding disclosure "except as authorized *by this title*") (emphasis added). Although there are a number of exceptions, none includes the issuance of press releases by the IRS. *See **id.**; **Thomas v. United States***, 890 F.2d 18, 20 (7th Cir. 1989).

One exception, however, authorizes disclosure of tax return information in a judicial proceeding to determine a taxpayer's civil or criminal tax liability. 26 U.S.C. § 6103(h)(4)(A). Citing ***Lampert***, Appellants contend that once tax return information is lawfully disclosed in such proceedings, it loses its confidentiality, rendering § 6103's prohibition moot. Johnson, citing ***Rodgers v. Hyatt***, 697 F.2d 899 (10th Cir. 1983), and ***Mallas v. United States***, 993 F.2d 1111 (4th Cir. 1993), counters that § 6103 prohibits disclosure despite prior publication of the information in court. In the alternative, Johnson maintains that, under the reasoning of ***Thomas v. United States***, liability under § 6103 is premised on the *source* of the information, not its "public" status (if any).

***Lampert*** involved press releases issued by the United States Attorney's office and the IRS that summarized tax evasion charges against three individuals. ***Lampert***, 854 F.2d at 336. The Ninth

Circuit began its analysis by explaining that the releases disclosed "return information" as defined by § 6103. *Id.* at 336-37 (citing **Barrett v. United States**, 795 F.2d 446, 449 (5th Cir. 1986)). *Contra* **Johnson**, 47 F.3d at 732 n.34 ("[L]anguage, which on its face purports only to describe the content of [a] criminal information, is not return information under section 6103(a)."). It then determined that, although § 6103 contained no exception authorizing this disclosure, giving effect to that language would frustrate the statute's purpose — to prohibit the disclosure of *confidential* return information. *Id.* at 338. (In so holding, it declined to follow the ruling in 1986 by the district court in this case. *Id*. at 337.) The court determined that, once tax return information is made a part of the public domain, a taxpayer "may no longer claim a right of privacy in that information". *Id.* Therefore, when such information is lawfully disclosed in a court proceeding, subsequent disclosure does not violate § 6103. *Id.*

The Ninth Circuit reaffirmed **Lampert** in **Schrambling Accountancy Corp. v. United States**, 937 F.2d 1485, 1489-90 (9th Cir. 1991), when it held that tax return information included in notices of federal tax liens and a bankruptcy petition lost their confidentiality and "[could] be disclosed again without regard to section 6103". As the court explained, "The relevant inquiry should focus on whether the prior authorized disclosure ... destroys the confidential nature of the information." *Id.* at 1488-89. Because tax liens are filed in the county recorder's office and are open for public inspection, the information in them is

exposed to even greater publicity than in a judicial proceeding. *Id.* at 1489.

In ***Rowley v. United States***, 76 F.3d 796 (6th Cir. 1996), the Sixth Circuit recently adopted the Ninth Circuit's approach. ***Rowley*** involved IRS disclosure of information (via newspaper ad) that, like the information in ***Schrambling***, had previously been disclosed in a publicly recorded tax lien. *Id.* at 798. The Sixth Circuit concluded that the prior, authorized, disclosure placed the information in the public domain, stripping it of its confidentiality. *Id.* at 801. The court did make an effort to distinguish cases where the prior disclosure occurred in a judicial proceeding, explaining that "the recording of a federal tax lien ... is designed to provide public notice and is thus qualitatively different from disclosures made in judicial proceedings, which are only incidentally made public". *Id.*

The Fourth and Tenth Circuits, however, have rejected the Ninth Circuit's analysis. ***Rodgers v. Hyatt***, from the Tenth Circuit, involved disclosure of tax return information by an IRS agent who had previously and lawfully disclosed that information in testimony in open court, *see* 26 U.S.C. § 6103(h)(4)(A). ***Rodgers***, 697 F.2d at 899-900. However, the second, challenged, disclosure was not governed by any of § 6103's exceptions. *Id.* at 904-06. The Tenth Circuit explained that the issue in a § 6103 case is *not confidentiality* but rather, whether an *unauthorized disclosure* of return information occurred. *Id.* at 906. The court noted that "[e]ven assuming the loss of confidentiality in the content of the

- 23 -

statements", the disclosure was "clearly unauthorized" because it lacked express statutory authorization. *Id.*

In *Mallas v. United States*, the Fourth Circuit followed the Tenth Circuit. There, the IRS issued a series of revenue agent reports to investors in a tax shelter, describing the convictions (later reversed) and "financing scheme" of the two individuals who set up the shelter. *Mallas*, 993 F. 2d at 1114-15. Noting that § 6103 contained no exception permitting disclosure of information "within the public domain", the Fourth Circuit declined the Government's "invitation to usurp the legislative function by adding a judicially created exception to those set forth by Congress". *Id.* at 1120. The court rejected the Government's contention that the Ninth Circuit's approach struck a better balance between taxpayer interests in privacy and the Government's interest in disclosing tax return information to administer the tax laws: "It is for Congress ... not this court, to 'strike a balance' between these interests. Congress has done so in section 6103, without articulating the exception advanced by the Government ... and adopted by the Ninth Circuit...." *Id.* at 1121.

The Seventh Circuit took a slightly different approach to § 6103 in *Thomas v. United States*, in which a taxpayer contested an assessment of taxes and lost in the United States Tax Court. *Thomas*, 890 F.2d at 19. The IRS then prepared a press release and mailed it to the taxpayer's hometown newspaper. *Id.* The Seventh Circuit explained that it refused to "retreat" from its earlier statement that § 6103 is a "general prohibition against the

disclosure of tax return information unless expressly authorized by an exception". *Id.* at 21 (quoting *Wiemerslage v. United States*, 838 F.2d 899, 902 (7th Cir. 1988)). However, it also refused to "take sides" in the conflict over whether disclosure of tax return information in a public record "bars the taxpayer from complaining about any subsequent disclosure". *Id.* at 20.

Instead, in ruling for the Government, the Seventh Circuit reasoned: "The information disclosed in the press release did not come from [the taxpayer's] tax return — not directly, at any rate. It came from the Tax Court's opinion." *Id.* at 20. For that reason, the Government was not disclosing tax return information within the meaning of § 6103, because "a return, or some internal document based on a return" was not the immediate *source* of the information. *Id.* at 20-21. When the source of the information is a public document, the definition of return information simply does not come into play, and there is no § 6103 violation. *Id.* A contrary holding, the court noted, would have serious First Amendment implications. *Id.* (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975)).

Consistent with the district court's summary judgment in 1986, we decline to follow the Ninth and Sixth Circuits and judicially create an exception to § 6103 for tax return information disclosed in "public records". Our analysis of the text of § 6103, the legislative history, and the pertinent case law compels us to conclude that there is simply no basis for creating such an exception. Instead, we follow the approach of the Fourth and Tenth

Circuits, modified by the Seventh Circuit's "source" analysis in *Thomas*. If the immediate source of the information claimed to be wrongfully disclosed is tax return information ("return" or "return information" pursuant to § 6103), the disclosure violates § 6103, *regardless* of whether that information has been previously disclosed (lawfully) in a judicial proceeding and has therefore arguably lost its taxpayer "confidentiality".

Section 6103, enacted as part of the Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 1976 U.S.C.C.A.N. (90 Stat.) 1520, 1667-88, enumerates 13 separate (and quite detailed) exceptions to § 6103, providing for disclosure to various federal and state agencies and employees for a variety of purposes. *Id.* Despite this elaborate structure, it is undisputed that the plain text of § 6103 contains no express exceptions permitting disclosure of tax return information that has arguably lost its confidentiality because it has been made available to the public via disclosure in open court. The circuits concur on this point, including the Ninth Circuit. *See Lampert*, 854 F.2d at 338. ("[A] strict, technical reading of the statute supports the taxpayers' position [that for a government employee to disclose any return information, confidential or not, there must exist an applicable exception to section 6103(a)]."); *Mallas*, 993 F.2d at 1120; *Rodgers*, 697 F.2d at 906; *cf. Thomas,* 890 F.2d at 20 ("[Section 6103] makes federal tax returns confidential with exceptions that do not include the issuance of press releases by the [IRS].").

As the Supreme Court stated, "When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances ... [such as] where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters.'" *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)) (citations omitted); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."); *United States v. Rodriguez-Rios*, 14 F.3d 1040, 1044 (5th Cir. 1994) (en banc).

Restated, we follow the plain meaning of a statute unless it would lead to a result "so bizarre that Congress 'could not have intended' it". *Demarest*, 498 U.S. at 191 (quoting *Griffin*, 458 U.S. at 575); *see United States v. Turkette*, 452 U.S. 576, 580 (1981) ("absurd results are to be avoided"); *see also Rodriguez-Rios*, 14 F.3d at 1044 ("We are authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress."); *Almendarez v. Barrett-Fisher Co.*, 762 F.2d 1275, 1278 (5th Cir. 1985) ("Literal application of statutory language is ... inappropriate if it would lead to ... unreasonable results.").

At first — even second, third, or fourth — glance, it appears that, to find a violation of § 6103 for disclosure of tax return information that was in most, if not all, respects previously disclosed in a court proceeding, is to reach an absurd result. But, in applying this rule of statutory construction, we must apply a reasoned, objective method for determining whether a result is actually "absurd" or whether, instead, it is simply personally disagreeable. In general, courts look to two sources to make this call — other provisions of the statute and legislative history. In this regard, two most instructive cases are *Demarest v. Manspeaker* and *Consumer Product Safety Commission v. GTE Sylvania, Inc.*

At issue in *Demarest* was whether 28 U.S.C. § 1821 required payment of witness fees to a convicted state prisoner who testified at a federal trial pursuant to a writ of habeas corpus *ad testificandum*. *Demarest*, 498 U.S. at 185. The plain language of the statute provided that "a witness in attendance at any court of the United States ... shall be paid ... $30 per day" and made no exceptions for incarcerated witnesses. *Id.* (quoting 28 U.S.C. § 1821(a),(b)). A unanimous Supreme Court held that the statute required payment of the witness fee. *Id.* at 188-91.

The Court looked to two other provisions in the statute, including a section providing for payment of a subsistence allowance (in addition to the daily fee) to witnesses "other than a witness who is incarcerated" and a section making detained aliens ineligible for either the daily fee or the subsistence allowance. *Id.* at 187-88. The Court noted, "[This] shows that Congress was

thinking about incarcerated individuals when it drafted the statute." *Id.* In other words, because other sections of the statute revealed that Congress had considered the possibility that prisoners might be witnesses in federal court, reading the section at issue to allow payment of the fee would not yield an "absurd" result or one that was at odds with congressional intent. *Id.* at 190-91.

*GTE Sylvania* involved § 6(b)(1) of the Consumer Product Safety Act (CPSA), which regulates the "public disclosure" of information collected by the Consumer Product Safety Commission (CPSC) regarding consumer products. *GTE Sylvania*, 447 U.S. at 104-05. Under § 6(b)(1), a product manufacturer must be notified 30 days before public disclosure of information and given the opportunity to submit comments about the information to be disclosed. *Id.* at 105. In this case, the CPSC had received accident reports from manufacturers. *Id.* at 106. After receiving Freedom of Information Act (FOIA) requests from two consumer groups, the CPSC decided to release these reports without complying with § 6(b)(1)'s notice/comment requirements. *Id.*

Section 6(b)(2) of the CPSA contains specific exceptions to the notification requirements of § 6(b)(1), none of which include disclosure in response to a FOIA request. *Id.* at 109. Nevertheless, the CPSC took the position that § 6(b)(1) applied only when it made affirmative disclosures and not when it simply responded to FOIA requests. *Id.* at 107-08. The Court rejected that position: "The fact that Congress was aware of the

relationship between § 6 and the FOIA when it enacted the CPSA is exhibited by the fact that the Congress in [a different part of § 6] specifically incorporated by reference the nine exemptions of the FOIA". *Id.* at 109. In addition, another section of the CPSA made disclosure of certain information subject to § 6(b)(1), whether the disclosure was an affirmative act by the CPSC or a response to a FOIA request. *Id.* at 110. Thus, the Court could not conclude that the failure to include FOIA requests within the exceptions to § 6(b)(1) was unintentional. *Id.*

In addition to looking to other parts of the statute, the Court looked to the legislative history of the CPSA. Upon examining that history, the Court concluded that "for purposes of § 6(b)(1)", no distinction was made between information "affirmatively disclosed" and information released pursuant to FOIA. *Id.* at 111-16. The restrictions of § 6(b)(1) were meant to govern the CPSC's disclosure of information in *all* circumstances, not only when the disclosure was pursuant to the CPSC's initiative. *Id.* at 112-13.

Turning to § 6103, we note that immediately following the express disclosure exceptions (§ 6103(c)-(o)) is a provision that explains the procedures by which disclosure requests are made to the IRS. 26 U.S.C. § 6103(p). Part of that provision is a list of "Safeguards", requiring that certain federal agencies to which the IRS may lawfully disclose return information must, *inter alia*: (1) establish a system of records to keep track of all disclosure requests, the date of request, and the reason for the request; (2)

establish a secure area in which to store the information; and (3) restrict the access of persons to that information. *Id.* § 6103(p)(4)(A)-(F). However, these record-keeping/security requirements "shall cease to apply with respect to any return or return information if, and to the extent that, such return or return information is disclosed in the course of any judicial or administrative proceeding and made a part of the public record thereof". *Id.* § 6103(p)(4).

For example, if the IRS discloses tax return information to the Department of Commerce (DOC) for statistical use, *id.* § 6103(j)(1), the DOC does not have to comply with § 6103(p)(4) safeguards if the information has already been disclosed publicly in a judicial proceeding. However, the fact that the DOC does not have to be as vigilant about the information does not mean that it (or the IRS, for that matter) can disclose that information in, for example, a press release. That information is *still* subject to § 6103(a)'s general rule of non-disclosure; § 6103(p)(4) does *not* create an exception to that rule.

Section 6103(p)(4) does, however, indicate that, when Congress drafted § 6103, it considered the possibility that some tax return information might be otherwise available to the public — *e.g.*, in court records, because it had been disclosed in a judicial proceeding. For that reason, Congress deemed it unnecessary for those federal agencies to follow the safeguards in § 6103(p)(4) for keeping the documents in a safe place and ensuring that access to them was restricted. That, however, is the only provision Congress

- 31 -

chose to make in § 6103 regarding this "publicized" tax return information. Under the reasoning of *Demarest* and *GTE Sylvania*, then, it is difficult to conclude that Congress' failure to include an exception for "public record" tax return information in the exceptions to § 6103 was unintentional.[1] *See Lindh v. Murphy*, No. 96-6298, 1997 WL 338568, at *4 (June 23, 1997) (reading provision expressly applying Antiterrorism and Effective Death Penalty Act's amendments to Chapter 154 to pending cases as "implicit" indication that amendments to Chapter 153 were meant to apply only to cases filed after effective date of act).

More generally, § 6103(m) indicates that Congress also considered the possibility that the IRS would need to disclose tax return information to the news media in certain circumstances. One of § 6103's exceptions, subsection (m), permits disclosure of taxpayer identity information to, *inter alia*, "the press and other

---

[1]    Of course, in describing this proposed exception to § 6103 as an exception for "publicized" or "public record" tax return information, we are not holding that the IRS, or any other federal agency, is prohibited from publishing the contents of a public record, such as a judicial opinion, *see Thomas*, 890 F.2d at 20-21, *provided it is the public record that is the immediate source*. Rather, as we explain *infra*, we simply hold that the fact that tax return information is *otherwise available* in the public record — and therefore arguably has lost its confidentiality — does not remove § 6103's proscription against improper disclosure of tax return information.

In addition, although Appellants' contention is that tax return information disclosed in a judicial proceeding has lost its confidentiality and, therefore, the protection of § 6103, we refer more broadly to this proposed exception as one for "public record" tax return information. It seems that the logical implication of Appellants' position is that any tax return information otherwise available to the public — whether it be in court records or real estate filings — would likewise have lost its confidentiality and the protection of § 6103.

media for purposes of notifying persons entitled to tax refunds when the Secretary, after reasonable effort and lapse of time, has been unable to locate such persons". 26 U.S.C. § 6103(m)(1). We note that this exception does *not* allow the IRS to disclose tax return information to identify individuals convicted of tax offenses (*e.g.*, Johnson) or, more broadly, individuals who appear in court concerning civil or criminal tax liability. Again, we cannot conclude that Congress' failure to include in § 6103 the exception Appellants press upon us was unintentional. Hence, applying the plain meaning of the statute leads to neither an absurd result nor one that is demonstrably at odds with congressional intent.

Furthermore, as in **GTE Sylvania**, the legislative history supports the conclusion that Congress considered the relationship between § 6103 and "public record" tax return information. In discussing the § 6103(p)(4) safeguard procedure, the Senate Finance Committee noted: "The *record-keeping requirements* would not apply in certain situations, including disclosure of returns and return information open to the public generally". S. REP. NO. 94-938, at 343 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3773 (emphasis added). Importantly, the committee did *not* say that the rule of nondisclosure does not apply where the information is open to the public generally.

In addition, Congress considered a taxpayer's privacy interest in tax return information when enumerating the exceptions to § 6103. In evaluating the areas in which tax return information was

formerly subject to disclosure and deciding whether to maintain such disclosure provision, the committee "balance[d] the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of the disclosure upon the continuation of compliance with our country's voluntary assessment system". *Id.* at 318, 1976 U.S.C.C.A.N. at 3747. In spite of this consideration, however, Congress chose not to create an exception for "public record" tax return information.

In judicially creating that exception, the Sixth Circuit explained: "[T]he approach we adopt today strikes the proper balance between a taxpayer's reasonable expectation of privacy and the government's legitimate interest in disclosing tax return information to the extent necessary for tax administration functions." *Rowley*, 76 F.3d at 802. We, however, agree with the Fourth Circuit: "It is for Congress ... to 'strike a balance' between these interests [and it] has done so in section 6103, without articulating [this] exception." *Mallas*, 993 F.2d at 1121. We are a federal appellate court, not a super-legislature; we are not vested with plenary authority to re-evaluate the policy choices made by our elected representatives. *See* THE FEDERALIST NO. 78 (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure for that of the legislative body.")

Section 6103 provides blanket protection to tax return information. If we recognized an exception for "public record" tax

return information, as the Ninth and Sixth Circuits have, we would be concluding that § 6103 distinguishes between confidential (private) and non-confidential (public) tax return information. *See* **Lampert**, 854 F.2d at 338 ("Once tax return information is made a part of the public domain, the taxpayer may no longer claim a right of privacy in that information."); *see also* **Rowley**, 76 F.3d at 801-02 (information in public domain loses confidentiality and protection of § 6103).  Appellants ask us to hold that § 6103 makes that distinction.

But, again, this flies in the face of § 6103.  It states that "[r]eturns and return information *shall be confidential*, and except as authorized by this title ... shall [not be] disclose[d]"; not that "[confidential] [r]eturns and return information ... shall [not be] disclose[d]".  (Emphasis added.)  This is a critical, indeed dispositive, difference.[2]

We recognized in our en banc opinion that § 6103 protects more than simply "confidential" or "private" return information:

> [S]ection 6103 is a regulation of the conduct of those who in the course of their duties as government employees or contractors glean

***

[2]     Before the Tax Reform Act of 1976, all returns were described as "public records", although they were open to inspection only under regulations approved by the President, or under Presidential order. *See* S. REP. NO. 94-938, at 315, 318, 1976 U.S.C.C.A.N. at 3744, 3747.  Despite that limitation, Congress decided that, under the new law, "returns and return information should generally be *treated* as confidential".  **Id.** at 318, 1976 U.S.C.C.A.N. at 3747 (emphasis added).  In other words, § 6103(a)'s description of tax return information as "confidential" does not represent a congressional conclusion that all such information is, in fact, confidential or private. Rather, it is simply a directive to treat that information as if it is confidential — *i.e.*, not to disclose it unless authorized by exception.

> information from tax returns.  The regulation
> is *prophylactic*, proscribing disclosure by
> such an individual of *any* such information *so
> obtained* by him.  Plainly, Congress was not
> determining that all the information on a tax
> return would always be truly private and
> intimate or embarrassing.  Rather, it was
> simply determining that since much of the
> information on tax returns does fall within
> that category, it was better to proscribe
> disclosure of all return information, rather
> than rely on *ad hoc* determinations by those
> with official access to returns as to whether
> particular items were or were not private,
> intimate or embarrassing.  Because such
> determinations would inevitably sometimes err,
> ultimately a broad prophylactic proscription
> would result in less disclosure by return
> handlers of such sensitive matters than would
> a more precisely tailored enactment.

*Johnson,* 47 F.3d at 735 (footnote omitted).  As an explicit construction of § 6103, this statement is law of the case, regardless of whether it was ultimately necessary to decide the issues necessary for that opinion.  *See* **Conway v. Chemical Leaman Tank Lines, Inc.**, 644 F.2d 1059, 1062 (5th Cir. 1981) ("As a general rule if the issues were decided, either expressly or by necessary implication, those determinations of law will be binding on remand and on a subsequent appeal.") (quoting **Lehrman v. Gulf Oil Corp.**, 500 F.2d 659, 663 (5th Cir. 1974)).

Thus, § 6103's protection does not disappear simply because tax return information has been disclosed in the public record and has therefore arguably lost its confidentiality.[3]  In enacting §

---

[3]    We say "arguably" because, as the Seventh Circuit has noted, it is a legal fiction that "every item of information contained in a public document is known to the whole world, so that further dissemination can do no additional harm to privacy".  **Thomas**, 890 F.2d at 21.  Like the Seventh Circuit, we eschew the idea that "only secrets [can] be confidences".  **Id.**

6103 as a prophylactic ban, Congress was determining that a taxpayer has a statutorily created "privacy" interest in *all* his tax return information, despite the fact that some of it is not entirely "secret".[4]  In another context, the Supreme Court has recognized that an individual can have a privacy interest in such information.  *See* ***United States Dep't of Justice v. Reporters Comm. for Freedom of the Press.***, 489 U.S. 749, 770 (1989) ("[T]he fact that 'an event is not wholly "private" does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'") (citation omitted).

That interest is furthered by a construction of § 6103 that premises a violation on the *source* of the information claimed to be wrongfully disclosed, not its public or non-confidential *status*.  *See* ***Thomas***, 890 F.2d at 21 (return information not disclosed if immediate source is not return or internal document based on

---

[4]     The brand new Taxpayer Browsing Protection Act, H.R. 1226 (5 Aug. 1997) (to be codified at 26 U.S.C. §§ 7213A and 7431) is further proof of this.  This law makes it unlawful for any federal employee "willfully to inspect, except as authorized in this title, any return or return information".  ***Id.*** § 2(a).  In addition, a taxpayer may sue the United States under § 7431 for civil damages for an unauthorized inspection.  ***Id.*** § 3(a).

That Congress deemed simply browsing through a tax return, even if no tax return information is ultimately disclosed, to be serious enough to merit criminal and civil penalties strengthens our interpretation of § 6103, which recognizes that all tax return information is protected, not simply the "private" or "confidential" portions.  In addition, although we hesitate to infer too much from this new law, we note that, on its face, it too does not distinguish between "public" and "private" tax return information.  Hence, a federal employee may be subject to criminal and civil liability even if he only browses through portions of a return or return information, and even though that data is otherwise available in public records.

return).  Again, our en banc court has already interpreted § 6103 as having precisely that focus.  In comparing § 6103 and the Texas tort of public disclosure of embarrassing private facts, our court noted:

> Unlike section 6103(a), the Texas tort ... is not concerned with the identity of the party making the disclosure, or his sources, but merely with whether the information disclosed is both private and intimate or embarrassing, and also not of public concern, *none* of which factors are relevant under the terms of section 6103(a).  The Texas tort and section 6103(a) address totally distinct subject matters and impose distinctly different duties: the latter, applicable only to certain individuals who in connection with their government-related duties obtain tax return information, enjoins them not to disclose any of it so obtained, even though it is not private and not intimate or embarrassing and is of public concern....

*Johnson*, 47 F.3d at 735-36.  Therefore, if tax return information is the immediate source for the information claimed to be wrongfully disclosed, it makes no difference that the information is neither "private" nor "confidential".

For this reason, we find unpersuasive Appellants' contention that this construction of § 6103 raises First Amendment concerns. For support, they cite the statement in our en banc opinion that, if § 6103 barred disclosure of matters of public record, "such a bar, at least as to recent federal felony convictions, would appear in some tension with [*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975)]".  *Johnson*, 47 F.3d at 737 n.46.  That statement, however, is *dicta*, because we expressly left open the question of whether to adopt the rule in *Lampert*.  *Id.*

- 38 -

More importantly, a closer inspection of **Cox Broadcasting** reveals that there are no First Amendment implications to our decision here. **Cox Broadcasting** involved a civil action brought under a Georgia statute that made it a misdemeanor to publicize or broadcast a rape victim's name. **Cox Broadcasting**, 420 U.S. at 471-72. A reporter, present in court when several rape defendants pled guilty, learned the victim's name from examining the indictments, which were available for his inspection in the courtroom. *Id.* at 472-73. He later broadcast a news report about the court proceedings, and the report named the victim. *Id.* at 473-74. The Court concluded that Georgia could not "impose sanctions on the publication of truthful information contained in official court records". *Id.* at 495.

The Court stressed the importance of having a free press to report on the operation and administration of our government, especially judicial proceedings like criminal prosecutions, which are events of legitimate concern to the public. *Id.* at 491-92, 495 ("[A] public benefit is performed by the reporting of the true contents of [public] records by the *media*. The freedom of the *press* to publish that information appears to us to be of critical importance to our type of government....") (emphasis added). But Government employees — *e.g.*, IRS agents — are not members of the media and therefore have no First Amendment responsibility to report on criminal proceedings or other government operations. Moreover, the media's source in **Cox Broadcasting** was court

documents, not information protected by a non-disclosure statute, such as § 6103.

In addition, the Court noted that accurate reports of judicial proceedings have special protection under the First Amendment. *Id.* at 492. But, as noted above, that protection arises only when the *source* of those reports is *public records* or personal observation of the events in court: "What transpires in the court room is public property.... *Those who see and hear what transpired* can report it with impunity." *Id.* at 492 (quoting **Craig v. Harney**, 331 U.S. 367, 374 (1947)) (emphasis added); *id.* at 491 (framing issue in case as "whether the State may impose sanctions on the accurate publication of the name of a rape victim *obtained from public records* — more specifically, *from judicial records* which are maintained in connection with a public prosecution and which *themselves* are open to public inspection") (emphasis added); *id.* at 495 ("*Public records* by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the *records* by the media.") (emphasis added).

That the Court did not address the issue present in our case is evident from the following disclaimer in the opinion:

> Appellants have contended that whether they derived the information in question from public records or instead through their own investigation, the First and Fourteenth Amendments bar any sanctions from being imposed by the State because of the publication. Because appellants have prevailed on more limited grounds, we need not address this broader challenge....

*Id.* at 497 n.27. In other words, **Cox Broadcasting**'s holding is limited to its factual context. Because under our analysis, § 6103 is violated only when tax return information — which is not a public record open to public inspection — is the immediate source of the information claimed to be wrongfully disclosed, the First Amendment concerns in **Cox Broadcasting** are not implicated here.

## ii.

Given this interpretation of § 6103, we must decide what tax return information was wrongfully disclosed in the releases. At the beginning of the 1996 trial, Johnson claimed six items: his age; his home address; the fact that he was executive vice-president of ANICO; the statement that he was charged with false business deductions and altering documents on his 1974 and 1975 returns; the statement that he would be required to pay back taxes plus penalties and interest; and his middle initial.[5]

But, our en banc opinion had already concluded that the statements about altering documents (charge portion) and about the penalties for Johnson's conviction (penalty portion) were not "return information" within the meaning of § 6103. **Johnson**, 47 F.3d at 732 n.34 (for charge portion: "language, which on its face purports only to describe the content of the criminal information, is not return information under section 6103(a)"; for penalty portion: "[it] in substance merely describes the known, universally

---

[5] It is clear from the record that "identity" refers to Johnson's middle initial ("E"). Under § 6103(b)(6), "taxpayer identity" includes "the name of a person with respect to whom a return is filed".

applicable legal consequences of willfully and knowingly filing a false and fraudulent income tax return understating the tax due by several thousand dollars"). Because neither of these two portions were tax return information, their inclusion in the press releases did not violate § 6103.

In addition, Appellants have conceded in this appeal — for the first time during this case — that Johnson's age, home address, and the word "vice-president" were wrongfully disclosed.[6] Appellants maintain that the district judge who sentenced Johnson in 1981 (Judge Gibson) referred to him as an "executive with American National Insurance Company"; therefore, they could disclose Johnson's affiliation with ANICO to that extent. Under their view, because Johnson's specific job title, vice-president, was not mentioned in open court, it could not be disclosed.

Neither Stone nor Sassen, however, attended the court proceedings at which Johnson pled guilty. Nor, prior to the release, did they examine the official transcript. Moreover, they could not have seen the transcript; it did not exist when the releases were issued. (The court reporter did not transcribe his

---

[6]    For this reason, Appellants conceded at oral argument that the public record exception they urge (and which we reject) would not apply to these three items and that, therefore, Johnson is entitled, at a minimum, to statutory liquidated damages of $1,000 per disclosure for the wrongful disclosure of these three items. *See* 26 U.S.C. § 7217(c)(1) (repealed). In its 1986 summary judgment, the district court held that, under § 7217(c)(1), Johnson would be entitled to $21,000 because Sassen sent the release to 21 news outlets. **Johnson**, 640 F. Supp. at 1135-36, 1139. Neither party has contested that aspect of the summary judgment ruling. Accordingly, it is law of the case.

notes and file the transcript until July 1981, over three months *after* the releases were issued.)

In fact, Stone admitted that *all* of the identifying information given to Sassen that is at issue in this case — age, middle initial, home address, and occupation (executive vice president of ANICO) — came either from Johnson's return file or from information "in his [Stone's] head" (that is, information that Stone had gathered during the course of investigating Johnson). Stone testified that *all* information gathered about a taxpayer, including data learned in the course of an investigation that is not actually present in a return or the return file, is protected by § 6103. Because neither public (court) records nor knowledge of the open court reference was the source for Johnson's occupation, *any* disclosure of his affiliation with ANICO, and not simply the word "vice-president", was a violation of § 6103.

As for Johnson's middle initial (E), there is a dispute, *outside this record*, over whether it was previously disclosed in public on the docket sheet for the 1981 criminal proceeding.[7]

_____

[7]  Appellants contend, for the first time on appeal, that a criminal docket sheet obtained from the district court by the Department of Justice's Office of Professional Responsibility includes Johnson's middle initial. That initial does not appear on the sheet entered in evidence by Johnson.

Obviously, underlying this contention is a most serious and potentially wide-ranging charge. Appellants ask us to take judicial notice of the sheet that they *claim* includes that initial. This we cannot do. For starters, even though they claim that the sheet "is on file in the district court", Appellants have not had that sheet included in the record on appeal. Nor is there a record before us that sheds light on which sheet is correct. In short, this contention is for another day and another forum, to possibly include the district court on remand.

However, because a § 6103 violation is premised on the *source* of the information claimed to be wrongfully disclosed, we need not determine whether the middle initial is in the public record, because it is not relevant to the question of whether § 6103 was violated. As noted above, in providing Sassen with the identifying information in the releases, Stone relied on Johnson's return file or information he had otherwise gathered about Johnson, not on any public (court) document. Therefore, the middle initial disclosure was a violation of § 6103.

In sum, four items in the releases were wrongfully disclosed: Johnson's middle initial (E), his age (59), his home address (25 Adler Circle), and his occupation (executive vice-president for the American National Insurance Corporation). The rest of the information in the releases was not wrongfully disclosed; this includes the two statements (charge and penalty portions) that our en banc court previously held were not § 6103 return information. *Johnson*, 47 F.3d at 732 n.34.

With the offending, identifying, information removed, the first release would have read as follows:

> GALVESTON, TEXAS--In U.S. District Court here, Apr. 10, Elvis Johnson pled guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson to a six-month suspended prison term and one year supervised probation.
>
> Johnson was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.

- 44 -

> In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest.

### c.

Johnson concedes on appeal that the charge and penalty portions did not constitute disclosure of tax return information. Again, the charge portion (most of the second paragraph) concerns crimes with which Johnson had been charged, including the erroneous information in the first release; the penalty portion (third paragraph), his being "required to pay back taxes, plus penalties and interest". Unfortunately, the jury was instructed otherwise. It was instructed that,

> as a matter of law, the April 1991 news releases at issue in this case *did disclose tax return information in violation of the law*. You have to decide whether one or more of the Defendants negligently or knowingly disclosed or permitted disclosure of *this* tax return information.

(Emphasis added.)

Appellants maintain that this instruction caused the jury to understand that all of the information in the releases was wrongfully disclosed; and that this affected the outcome of the case, mandating reversal and remand for a new trial. Johnson counters that there was no error because he

> did not contend at trial that those [charge and penalty] portions of the press release were tax return information or that they caused Johnson damages. Johnson argued only that inclusion of these statements in the press release was relevant to Appellants' negligent and knowing conduct.

Our standard of review bears repeating. Appellants "must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations"; and, even then, "we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Mijalis*, 15 F.3d at 1318 (internal quotations omitted).

There is no dispute that the Appellants timely and properly objected to the given instruction. Concomitantly, their written proposed instructions stated that the charge and penalty portions were not return information. Accordingly, their proposed instruction correctly stated the law.

At the conclusion of the narrowing of issues colloquy at the start of trial, the court ruled that it (through Chief Judge Singleton) had already ruled that there had been a disclosure of tax return information; and that the ruling stood. It later asked counsel: "How do you then submit to the jury the issue of the disclosure of confidential information? The jury can't go back in the jury room and say, now what was disclosed? The jury can't be confused about what constituted [tax return] information or what remains." We conclude that, because of the instruction and the evidence as to what was, or was not, tax return information, the jury was confused in that fashion.

Along this same line, at the charge conference, the court worked from the proposed instructions submitted by Johnson. As noted, it rejected Appellants' instructions, including those

concerning the charge and penalty portions not constituting return information. It did so without explaining why. (Pursuant to comments the court made to Appellants' counsel during a bench conference, it appears that the court may have felt that the penalty portion was an improper disclosure, notwithstanding our en banc ruling to the contrary.)

As required, we have considered the charge as a whole. We conclude that the "substantial and ineradicable doubt whether the jury has been properly guided" prong is met.

Moving to the "affected the outcome" prong, we review the entire record in making that call. We complied with that duty, and then some. This record has been examined, and re-examined; it has been dissected in minute detail.

Obviously, in determining whether the erroneous instruction "affected the outcome", an important aspect is the positions, or bases for liability, advanced by counsel at trial, as well as the evidence adduced. Such bases and evidence are the soil in which the instructions are planted; they bear on the jury's application of the law (instructions) to the evidence.

Despite his claim here that he "did not contend at trial that [the charge and penalty] portions of the press release were tax return information or that they caused [him] damages", Johnson repeatedly did just the opposite at trial, either expressly or by implication. This had an effect on the district judge's evidentiary rulings, which of course, bore on the evidence to which the instruction was applied. Likewise, this affected the jury's

application of the instructions to the evidence. As hereinafter described, different counsel for Johnson took different lines of attack. They were out of step not only as to whether the charge and penalty portions were improper disclosures of tax return information but also as to how Johnson's conviction should be utilized or presented. Both aspects were elements in the instructions affecting the outcome.

Concerning the charge and penalty portions, Johnson's amended complaint claimed that they *were* tax return information. He made this a contested issue of law in the pretrial order.

Along that line, in addressing at the start of trial what issues remained for the jury, in the light of Chief Judge Singleton's 1986 and 1991 rulings and our en banc opinion, Appellants noted that the latter held that the charge and penalty portions did not constitute tax return information. In response, Johnson urged that the summary judgment granted him in 1986 had not been overturned, and stated: "There are comments made by the Fifth Circuit in their [en banc] opinion that certain things did not constitute tax return information, but ... [the court] did not overrule the finding by Chief Judge Singleton that tax information" had been disclosed. A lengthy colloquy ensued between the court and counsel as to the effect of our en banc opinion. Unfortunately, how to deal with what was not tax return information — the charge and penalty portions — got lost in the shuffle. Even more unfortunate, it remained lost throughout the balance of the trial.

There is no dispute that Johnson's conviction could be revealed in a press release. And, again, it is undisputed that the charge and penalty portions were not tax return information; therefore, the information contained in these portions was not improperly disclosed. The causation issue for the jury was whether, as a result of only the *improperly* disclosed information, not simply because there were press releases, Johnson lost his job. In other words, a key issue was whether identifying information in the releases that was disclosed in violation of § 6103 caused that job loss. Admittedly, a very strong argument can be made that, but for the *improperly* disclosed information, which identified him, Johnson would not have been linked with the person made the subject of the press releases. (See the redacted release, *supra*.) Johnson's counsel, however, did not take that position consistently at trial. And, the jury instruction prevented that issue from being clearly presented to the jury.

The error in the instruction was assisted in its "effect on the outcome" metamorphosis by the actions of Johnson's counsel throughout the trial. For example, in his voir dire, Johnson's counsel stated: "The IRS publicized [Johnson's conviction], and as a result of publicizing that, he lost his career, plain and simple. That's what this case is about." But, again, that is not what the case is about. Later in voir dire, Johnson's counsel stated that it "was a violation of law to issue that press release". Now, reading between the lines, perhaps Johnson's counsel meant that it was a violation of law to disclose part of the information in the

release. That, however, is not what was said to the jury. The foregoing statements are fairly typical of overstatements made by Johnson's counsel throughout trial, including in questioning witnesses.

The tactic employed in voir dire was utilized in Johnson's opening statement. The press releases, rather than the portions that constituted an improper disclosure of tax return information, were attacked, as was Johnson's conviction.

Johnson's counsel often questioned witnesses about the specific improperly disclosed tax return information; but, they kept undoing that by attacking the press releases in *toto*, confusing the issue. It may well be that, as claimed by Johnson, such attacks were relevant; that the mistakes or errors relating to the charge and penalty portions supported finding negligent or knowing disclosure of the four items of tax return information. In any event, care should have been taken in adducing such proof. It was not.

For example, in questioning Johnson's own expert, Johnson's counsel asked him to agree that, in issuing a press release, the "need for speed, to get it out now, ... should not be allowed to overcome a need to make sure it's right". But, again, the issue at trial was not whether the press release was "right"; it was whether the release contained improperly disclosed tax return information. Perhaps, that is what counsel meant through the use of the word "right". And, several questions leading up to that question had

been along that line.  But, again, Johnson's counsel kept undoing his case through use of such overbroad questions.

These questions focus the jury, somewhat ambiguously, on the errors in the first release (which are not return information) and suggest that those errors are what caused Johnson's dismissal. Again, negligence in *drafting* the charge and penalty portions of the release may support an inference of knowing or negligent *disclosure of* the four items of tax return information (because the release was written all at once, not piecemeal), but this distinction must be made clear to the jury.  It was not.

As another example, Johnson's counsel asked one of the Appellants to agree that he "didn't take out any of the identifying information, and you didn't tell Ms. Sassen to take out anything about Mr. Johnson owing back taxes, penalties, or interest, did you?"  Again, by linking the penalty portion with the identifying information, this question suggests that the penalty portion was § 6103 "return information", when our en banc court had already held to the contrary.

Johnson's counsel compounded the error by next asking: "The fact that Mr. Johnson will be required to pay back taxes, penalties and interest, where does that appear in a Court record or other public record?"  This question again implies that the penalty portion was improperly taken from Johnson's return file (which implies that it was § 6103 "return information" in the first place).  And the next question only reinforces this implication: "How do you determine, Mr. Sawyer, if somebody owes back taxes?

You have to look at their tax files, don't you? You can't get that from the public record or the Court record in this case?" Given that both Stone and Sassen admitted that Johnson's return file was the source of the identifying information, questioning about the charge and penalty portions was unnecessary to prove that § 6103 was violated.

As reflected in the foregoing examples, we conclude that the erroneous instruction affected the outcome. Based on our reading of the whole record, it is possible that the jury determined that the charge and penalty portions were "return information" and that they damaged Johnson in some way. If that is so, the jury may have found Appellants liable under § 7217 for conduct that did not violate § 6103 in the first place. In short, when the jury applied the erroneous instruction to such evidence, we have no doubt that the error in the instruction — indicating that the charge and penalty portions were improperly disclosed — affected the outcome of the case, both as to liability and as to damages.

As stated, in determining whether the instruction affected the outcome, we obviously did so against the backdrop of the record. Our conclusion that the erroneous instruction did affect the outcome is buttressed by the jury's susceptibility to applying the instruction improperly due to appeals to prejudice by Johnson's counsel against the IRS and its personnel. Johnson's closing argument included an attack on his conviction, as had been done in his opening statement. But, the conviction was not at issue; it was not open to attack. Of course, the conviction tied directly

into the charge and penalty portions, which the instruction implied were improperly disclosed.

Johnson's conviction was a trigger point for the jury, a point pulled improperly and repeatedly by one of Johnson's lawyers. He stated: "So they find what they consider to be a $3,000 discrepancy in his return, $3,500. So they undertake to make a criminal case of it. They spend four years on it." He later asked the jury: "Who is the next trophy kill? Me? You?", and then stated:

> My CPAs pour over and prepare my tax returns. I guess I'm going to have to sit down and read them real close myself and go over everything. I got [sic] a big enough name. Boy, they would love to put it up on the wall.

(Amazingly, Appellants' counsel did not object to these remarks. We are confident that such appeals to prejudice will not reoccur on remand.)

Each of the jurors had a set of the instructions. Because of the complexity and intricacy of the issues in this case, a correct jury instruction was needed more than ever. The jury did not receive one. Because the instruction both improperly guided the jury and affected the outcome, we must vacate and remand for a new trial.

2.

The court instructed that the Appellants could be liable under § 7217 for "negligently or knowingly ... disclosing or *permitting the disclosure of* tax return information". (Emphasis added.) Asserting that only Sassen made a "disclosure" within the meaning of § 6103, the other Appellants maintain that persons who *permit*

disclosures or who *negligently supervise* others who make disclosures cannot be held liable under § 7217.

Appellants moved at trial for judgment as a matter of law on this issue and raised timely objections in each instance at the charge conference. On the other hand, they do not challenge the sufficiency of the evidence. Therefore, at issue is only whether, as a matter of law, they could disclose by their own actions, including by permitting another to do so.

We find no error. "Disclosure" is defined by § 6103 as "the making known to any person *in any manner whatever* a return or return information". 26 U.S.C. § 6103(b)(8) (emphasis added). We agree with Johnson that, under the plain meaning of the statute, IRS agents like Stone and IRS supervisors like Orth, Braun, and Sawyer can "make known" return information in "some manner" without actually putting their names on a press release and mailing it to a news outlet. In this regard, we are informed by *Chandler v. United States*, 687 F. Supp. 1515 (C.D. Utah 1988), *aff'd*, 887 F.2d 1397 (10th Cir. 1989). (There is a dearth of law on this point.)

In *Chandler*, an IRS teller received a penalty check that failed to contain a taxpayer identification number (TIN). *Id.* at 1516. The teller accessed the taxpayer account via computer but mistakenly transcribed the number onto the check. *Id.* Consequently, the taxpayer's account was not credited with those funds, and an IRS revenue officer mailed a notice of levy to the taxpayer's place of employment to collect the penalty. *Id.* The taxpayer brought suit against the United States under 26 U.S.C. §

7431.  *See supra* (§ 7217 and § 7431 contain same definition of disclosure and same predicate for liability).

Because the Government conceded that the notice of levy disclosed tax return information, 687 F. Supp. at 1516 n.1, the issue was whether the disclosure was the result of negligence (or willfulness).  The court concluded that several IRS officers were negligent, including the teller.  *Id.* at 1521.  The court reached this conclusion despite the fact that it was the *revenue officer* who actually mailed the notice of levy and despite the fact that the teller's only contribution to that action was in transcribing the TIN incorrectly.  *Id.*  Nevertheless, the negligent conduct of the teller was actionable under § 7431.

We agree with **Chandler** that § 7217 expands the universe of liability beyond the federal employee who actually "publishes" tax return information.  Other individuals in the chain of causation who contribute to a wrongful disclosure (either by acting or by failing to act) are proper party-defendants in a § 7217 action. Stone, who supplied the tax return information to Sassen for the first release, and supervisors Orth, Braun, and Sawyer, who approved and/or were personally involved in the first or second release are equally as subject to liability under § 7217 as Sassen, who distributed both releases.  Therefore, it was not error to instruct the jury in that regard.

### 3.

Because resolution of Appellants' challenge to four more instructions must be left to the district court on remand, based on

- 55 -

the record developed on retrial, we do not reach these issues. On the other hand, we discuss them simply to assist the district court on remand in deciding what is, and is not, law of the case.

a.

The district court denied Appellants' proposed instruction that Securities and Exchange Commission regulations would have required ANICO to file a public report that Johnson had been convicted of tax evasion. In our en banc opinion, we judicially noticed the SEC regulations that would require ANICO to file a report with the SEC that disclosed the fact that a director or executive officer had been involved in a legal proceeding that was "*material* to an evaluation of the ability or integrity" of that person. *Johnson*, 47 F.3d at 733-34 & n.36 (quoting 17 C.F.R. § 229.401(f)) (emphasis added). We suggested that Johnson's conviction would be material under these regulations. *Id.* at 736-37 ("The law has long considered conviction of any felony as material to an evaluation of the integrity of the person so convicted.").

But, no evidence on materiality was presented. Because we remand for a new trial, and because of the possible factual underpinnings for this claim, including the questions of whether the SEC report would be relevant to the causation issue or to mitigation of damages, we decline to address this claim, assuming *arguendo* it was even properly presented here. Whether this instruction should be given is best left to the district court, when this matter is tried anew.

b.

The jury was instructed with respect to Sassen:

> In judging whether defendant Sassen was negligent and/or knowingly violated the law, you should ask yourself, did defendant Sassen coordinate as she was required to do with Branch Chief defendant Orth, and with the prosecuting attorney, U.S. Attorney Powers?

The basis of this instruction was the earlier described DDM which stated:  "The DPAO [Sassen] will coordinate all CID releases with the Branch Chief, Criminal Investigation Division [Orth], and the prosecuting U.S. Attorney [Powers]."  Appellants maintain that noncompliance with an internal agency guideline does not give rise to an actionable claim.

One of Appellants' own witnesses, the IRS official who signed this DDM, testified that Sassen was required to follow the guidelines in the DDMs in issuing press releases.  In other words, there was no dispute that Sassen should have followed the "coordination" directive in issuing the two releases.  She testified about her understanding of the term "coordinate" and about her actions in that regard, such as communicating with Stone.  But, as discussed, Sassen also admits that she did not communicate with Powers.

Again, because this matter will be tried anew, and because of the factual nature of this issue, we will not address it.  It remains for the district court on retrial.

c.

According to Appellants, the court did not explain to the jury which side had the burden of proof on each element of Johnson's

- 57 -

case. Although Appellants maintain that the court properly instructed the jury that Johnson carried that burden on the element of proximate cause (Question No. 3), they contend that the jury may have been misled into thinking that Appellants bore the burden of disproving that they were negligent (Question No. 1). Once again, this question is best left to the court on remand in framing its instructions.

d.

The district court refused to read to the jury the facts stipulated in the pre-trial order. This is yet another question best left to the court on remand. For example, even if stipulated facts are to be presented to the jury by instruction or otherwise, not all of them necessarily would be. One of the stipulated facts was that the judge who sentenced Johnson referred to him as an "executive for the American National Insurance Company". This is the stipulation Appellants especially wanted presented. But, as the district court ruled, and as discussed *supra* and *infra*, that fact is not legally relevant; therefore, on remand, it should not be presented to the jury, despite being stipulated to factually.

B.

Stone and Orth maintain that they should have been dismissed because Johnson's second amended complaint, which added them as defendants, was filed approximately 16 months after the limitations period had run. (Section 7217 has a two year period that runs from the date of the wrongful disclosure. 26 U.S.C. § 7217(d) (repealed).) Johnson responds that under FED. R. CIV. P. 15(c), the

- 58 -

second amended complaint relates back to the timely filed original complaint. In its 1986 ruling, the district court denied summary judgment for Stone and Orth on this issue on the grounds that the elements of Rule 15(c) were satisfied. *Johnson*, 640 F. Supp. at 1134-35. This was the only occasion on which they presented this issue.

We have no occasion to re-examine that ruling because Stone and Orth have failed to preserve this issue for review. First, as discussed, we cannot review the 1986 denial of their summary judgment motion; such interlocutory orders are not to be reviewed where final judgment adverse to the movant is rendered on the basis of a subsequent full trial on the merits. *See Black*, 22 F.3d at 570.

And second, Stone and Orth did not re-urge the limitations issue in their Rule 50 motions at trial. Such motions should include *all* possible grounds, legal and factual, for judgment as a matter of law. *Id.* at 571 n.5 (rejecting dual system for evaluating denials of summary judgment). We decline to exercise our discretion to address this issue on appeal. *See, e.g, Highlands Ins. Co. v. National Union Fire Ins. Co.*, 27 F.3d 1027, 1031-32 (5th Cir. 1994).

C.

Appellants contest several evidentiary rulings. But,

> [w]e will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error.

*Mijalis*, 15 F.3d at 1318-19; *see* FED. R. EVID. 103. We decide only one of the claims.

## 1.

Concerning the transcript of Johnson's guilty plea hearing being excluded, Appellants intended to rely on it to show that Johnson's affiliation with ANICO was disclosed in court at the plea hearing on 10 April, before the first release. But under our construction of § 6103, it is irrelevant whether that tax return information was disclosed in open court. Neither Stone nor Sassen was present in court when Johnson pled guilty. Both admitted that the source of the information in the release was Johnson's return file, not the transcript or other court documents. (Moreover, the transcript could not have been the source; it was not filed until 24 July 1981, over three months *after* the releases were issued.) Consequently, the transcript was properly excluded.

## 2.

As was done for most of the challenged instructions, the remaining claims are presented simply to clarify what is, and is not, law of the case.

### a.

Appellants contest two of Johnson's expert witnesses, James Caldwell and Tim Millis, being allowed to testify. They maintain that both Caldwell and Millis offered opinions on legal questions such as whether Appellants had violated the law and whether their conduct was intentional and reckless. Our standard of review in such instances, however, is very limited: "The decision to admit

expert testimony lies within the district court's sound discretion and will not be overturned unless manifestly erroneous." ***United States v. Willey***, 57 F.3d 1374, 1389 (5th Cir. 1995). In any event, this issue remains for the court on remand. Obviously, it will be framed by the issues and evidence presented.

b.

Clay, President and CEO of ANICO in 1981, was a key witness because he supported Appellants' contention that it was the fact of Johnson's conviction, not the publicity surrounding it, that cost Johnson his job. Clay testified that he asked Johnson to resign on Thursday, 16 April, before learning of the release and after a conference with two members of the board of directors (Duncan and Randall) and a telephone poll of most of the rest of the board.

The district court did not allow Clay to testify as to what the other directors, particularly Duncan and Randall, had said to him (Clay). In the proffer of that testimony, Clay stated that Duncan and Randall had told him to dismiss Johnson immediately because "they could not have a senior officer of the company, particularly a fiduciary-type company, with a felony conviction being a senior officer".

Of course, this testimony is hearsay, FED. R. EVID. 801(c); it was offered for the truth of the matter stated — *i.e.*, that ANICO "dismissed" Johnson because of the conviction, not because of the press release. This is yet another issue that is best left to the district court on remand. It must be decided based on the evidence presented at the new trial and, in fact, may not even arise.

c.

Appellants appear to contend that the trial court erred in permitting Irwin Herz, one of ANICO's outside counsel in 1981, to give hearsay testimony. He testified, with a limiting instruction from the court, about his discussions with one of ANICO's most influential board members regarding Johnson. According to Herz, that board member told him that Johnson had been terminated because of publicity stemming from his guilty plea, not because of the conviction itself. This is another issue, assuming it is presented, for the court at the trial on remand.

d.

As noted, an individual is not liable for an unauthorized disclosure based on "a good faith, but erroneous, interpretation of section 6103". 26 U.S.C. § 7217(b). Appellants maintain that they were erroneously prohibited from presenting evidence concerning their good faith defense — that reliance on internal manuals and regulations is relevant to that defense.

At trial, the DDM requirement that Sassen "coordinate" all press releases with Powers was highly disputed. Johnson maintained that the DDM required Sassen to actually contact Powers; Appellants countered that Sassen could coordinate with Powers indirectly, *via* Stone. Appellants attempted to present testimony from Robert McKeever, the district director of the Austin District in 1981, and H.C. Longley, the acting district director who signed the DDM, as to the meaning of "coordinate" in the DDM. The court refused to allow that testimony.

Once again, this is an issue that must be decided at the trial on remand.

D.

The final issue is Appellants' request that, on remand, this case be reassigned because Judge Hoyt did not have the requisite "appearance of impartiality". A federal appellate court has supervisory powers to do so as part of a remand order. *See* 28 U.S.C. § 2106 ("[A] court of appellate jurisdiction may ... require such further proceedings to be had as may be just under the circumstances."); *Liteky v. United States*, 114 S. Ct. 1147, 1156-57 (1994) (source of this supervisory power is § 2106 and recusal statute, 28 U.S.C. § 455(a)); *In Re John H. McBryde*, No. 95-11082, 1997 WL 367349, at *24 (5th Cir. July 2, 1997); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 98 (3d Cir. 1992); *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1523 (9th Cir. 1985); *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc). For most obvious reasons, "[t]he power to reassign pending cases is an extraordinary one"; it is "rarely invoked". *In Re John H. McBryde*, 1997 WL 367349, at *24.

Several circuits invoke such powers not just when actual bias or prejudice exists but when the facts "might reasonably cause an objective observer to question [the judge's] impartiality". *Microsoft*, 56 F.3d at 1463 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)); *see Haines*, 975 F.2d

at 98 (purpose of reassignment is "to avoid both bias and the appearance of bias"); **Torkington**, 874 F.2d at 1446 ("Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public."). Other circuits have adopted a more formal test, in which the following three factors are considered:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

**Davis & Cox v. Summa Corp.**, 751 F.2d 1507, 1523 (9th Cir. 1985) (quoting **Robin**, 553 F.2d at 10); *see* **Robin**, 553 F.2d at 10. We need not decide which test to utilize. We conclude that, under either test, reassignment is required.

In explaining why this case must be reassigned, we view it in the light of its tortured, expansive (and expensive) history. The district judge was given a hotly contested, extremely emotional case that had been pending for more than ten years, one that was the subject of extensive opinions by a different district judge in 1986 and 1991 and by our en banc court in 1995, by which law of the case on some points had been established. And, there was some tension between our en banc and the district court opinions.

Moreover, there was immediate, continuing, and ever-increasing tension between the district judge and one of Appellants' counsel, who had tried the earlier FTCA claim. Added to this volatile mix was the tension between the Appellants and Powers, the Assistant United States Attorney who had handled the tax conviction in 1981; as described, he basically remembered nothing. The closest he came to remembering anything was reviewing a press release — apparently the second (revised) release.

Accordingly, the district judge was justifiably concerned about truthfulness by the witnesses. Although we question the extent, and manner by which, he pressed that concern, as well as the extent and manner of his being at odds with the above-referenced Appellants' counsel, that, of course, is not why we conclude that this case must be reassigned. The district judge was on the scene; we will not, and cannot, question his decisions in these regards. *See* **Liteky**, 114 S. Ct. at 1157.

And, we have no doubt that the district judge could put out of his mind, or disregard, his prior conclusions on those matters we have found on this appeal to be erroneous, especially the erroneous jury instruction that compels a new trial. On the other hand, reassignment of this case is required because of the necessity to preserve the appearance of impartiality, fairness, and justice. (The loss of efficiency and economy pales in comparison to this.)

Suffice it to say, few indeed are those who would list the IRS and its personnel as an entity or individuals with which or whom they want to deal. Tax return preparation and tax payment are

- 65 -

enjoyed by few, if any.  Many transfer this dislike to those who collect those taxes and administer our tax system.  This has been true since taxes were first levied and collected.  But, no one can dispute that persons in the tax collection business, just like anyone else, are entitled to a fair trial.  We know that the district judge agrees.

Likewise, no one can dispute that, generally, the American public is entitled to know about the business of its courts and the proceedings in them.  We so noted in our en banc opinion.  *Johnson*, 47 F.3d at 736 n.41, 737 & n.45.

Toward that end, press releases are one means to so advise the American public.  The need or reason for releases about tax convictions was one of the numerous matters hotly contested at trial.  Appellants posit they are needed to help promote or ensure voluntary tax compliance and to let the public know that everyone, no matter his status or station, is treated the same; Johnson counters that the release was to trumpet "bagging a trophy".  But, as stated, the press release *qua* press release was not at issue; at issue was improper disclosure of tax return information.

Nor was Johnson's conviction at issue.  In our en banc opinion, we noted that, regarding the FTCA ruling, Chief Judge Singleton "apparently credited all [the Johnsons'] testimony" concerning the fact that "he was not guilty of tax evasion and that he was wholly unaware that any items claimed as business expenses on his return were factually false or overstated".  *Johnson*, 47 F.3d at 722.  We commented that, "[i]n so doing, the court in

effect rejected the government's contention that 'this is a matter of *res judicata*, it's not open to attack.' In this respect, the district court clearly erred". **Id**. at 722 n.13. This notwithstanding, Judge Hoyt appeared to, if not expressly, disagree with the very fact of the conviction and of the events leading up to it. For example, in a heated colloquy with Appellants' counsel outside the presence of the jury, Judge Hoyt stated:

> This is no game down here. This is serious,
> and it's so serious it scares me to death;
> that I could be prosecuted by somebody who
> decides that they [sic] are not going to let
> me pay $3500 in taxes.

Along this line, as discussed *infra*, the district court's post-trial opinion replows the ground of Johnson's conviction and again implies that it was improper.

The court's tension with, and appearance of bias against, Appellants was immediate. For example, the court asked the following question during voir dire:

> Now, how many of you have a bone to pick,
> *other than me*, with the Internal Revenue
> Service?" Let's see a show of frank hands....
>
> You don't have to worry about it. See, you
> are on hallowed ground now. I don't care what
> an IRS agent might want to do to you, you can
> raise your hand.

(Emphasis added.) Such comments might simply have been intended to put the potential jurors at ease. But, it was not an isolated incident; this bias or antagonism, *see* **Liteky**, 114 S. Ct. at 1157, toward Appellants in particular, and the Internal Revenue Service in general, continued, if not increased, throughout the trial.

In the above-referenced colloquy, in which the court commented about the IRS not allowing payment of "$3,500 in taxes", the court had earlier commented:

> This is not something that's insignificant. All of you probably would be in the penitentiary if they had prosecuted you [under the criminal statute for improper tax information disclosure]. So don't make the mistake of lying here, because you open yourself up to prosecution.

During yet another of the many contentious colloquies with Appellants' counsel, in which the court was expressing dismay because Appellants were testifying that they believed the disclosures had not been improper (which arguably bore on their "good faith, but erroneous, interpretation" of § 6103 defense), the court stated:

> And yet they would get on the witness stand and testify that they believe that they can release this information this very day.
>
> Is that because they disagree with [the court's 1986] ruling or because you [Appellants' counsel] told them that my ruling isn't right?
>
> You see, if they had read these opinions, any person with any common sense would not get on the witness stand and say, in the face of the Judge who just told them, there is something wrong with your thinking here; and they get up there and they say, well, you know, I could still do this.
>
> I [as the court] have already ruled as a matter of law they can't. I [as the court] did that in 1986. I [as the court] did it again in 1991.
>
> If they have not read these opinions, then they should, because there is no basis in common sense, not in law or fact, but no basis in common sense for anybody to get on the

> witness stand and tell a person to their face, who has the job and responsibility of determining what the rule of law is and how to interpret it: *Judge, you did it, but piss on you. I have a different opinion*.

(Emphasis added.) In another ruling, the court stated: "It seems to me the problem is one of disingenuousness on the part of witnesses getting up here and saying they don't know anything. They're lying through their teeth. That's all that means."

Yet another example of this tension, evidencing a "high degree of antagonism", *see **Liteky***, 114 S. Ct at 1157, and the appearance of a lack of impartiality, that we must remove through reassignment, is reflected in a dispute between the court and Appellants' counsel over the definition of hearsay, during which the court stated: "Oh, excuse the hell out of me. That's what I learned in law school...." And, at the conclusion of the trial, after the verdict was rendered and the jury released, the court stated to counsel:

> Let me just make a couple of observations before you leave this afternoon. I have been concerned, as far as the lawyers are concerned, about the conduct of the lawyers in this case. I am also concerned about how we spend our money in this United States of America; and I say that because I don't know how in the world you can present a defense, [Appellants' counsel], by having people say, first of all, they didn't do it, then say, I did what I did in good faith, and then say, but I would do it again.
>
> There is no good faith defense to anything of this sort as a matter of law when those kind of options are put to the jury because the answers are internally in conflict with each other.

> And now we all know why those folk [sic]
> are hanging out in Minnesota, because some of
> us are so arrogant, in the work we do for the
> people of the United States, that there are
> other people who are waiting for the next
> revolution.
>
> And they're going to bring it about if
> you and I and others like us don't do
> something now to stop this kind of insanity.
> This is insane. And the tax payers should not
> be paying 10 - $15 million out because it
> doesn't cost you anything to come down here to
> try this case.
>
> It is a sad day for the government and
> for the United States of America.
>
> Good Luck.

The final, and perhaps most illustrative, instances of the appearance of partiality are found in the district court's post-trial opinion, referenced earlier. One example suffices. A factual background section entitled "PUBLICIZING THE 'TROPHY'" had an explanatory footnote:

> In the opening statement, the United States
> Attorney from the Department of Justice
> described the Johnson case as a "trophy case."
> Apparently, the IRS takes special pride in
> publicizing prosecuting a person who hold[s]
> an executive position in a large corporation.

But, the "opening statement" comment attributed to Appellants' counsel was made *instead* by Johnson's:

> I was, frankly, stunned by something I heard
> yesterday said [during voir dire] by the
> United States Attorney sent all the way down
> from Washington, D.C.[,] to defend the IRS
> agents. He stood before you and he told you
> what, essentially, their position was. He
> said, you know, the IRS can choose to
> prosecute a lot of people, but we engage in
> selective prosecution. If we can find
> somebody with a big name, somebody who's an
> executive in an important company, that's who

we love to prosecute, because they are a *trophy*.

Even though it was only $3500, Johnny Johnson got selected because Johnny Johnson was a *trophy*. Do you remember him telling you that? Now, he didn't use all the words I have used, but that's what he said.

And they want a *trophy* because they want publicity, and he told you that; and then he said that we particularly love to get this publicity around April the 15th when people have to file their taxes. Remember those words? His words not mine.

The press release that was issued by the IRS concerning Johnny Johnson was issued on April the 13th, April the 13th. You will get to see the press release with your own eyes, and you will get to see the date.

(Emphasis added.)

What Appellants' counsel had actually said during voir dire was quite different:

Now, despite the great size of the Internal Revenue Service and what we constantly hear of as the resources of the United States, the Criminal Investigation Division can only investigate and prosecute a small percentage of the cases that come to their attention, so that within the Internal Revenue Service there is a very involved procedure whereby men and women known as revenue agents make referrals from the examination division to the criminal division.

Most of those cases never are taken to a criminal prosecution because along the way the people in the Criminal Investigation Division decide its doesn't have prosecution merit, there isn't enough money involved, or the person is too old to serve a jail term; and then it has to go through the Department of Justice, because the Internal Revenue Service cannot prosecute a case itself.

Once it goes to the Internal Revenue Service - - the Department of Justice, the Department of

Justice makes a further cut in those cases and kicks a whole bunch out, so that by the end of the year, of all the thousands and thousands of matters that comes to the attention of the Criminal Investigation Division of the Internal Revenue Service, only a very small number, just over a thousand for this entire country, are prosecuted.

Now, having those limited resources, partly because that's all they can get, and partly because we don't want to turn this nation into a police state, one of the ways that the Internal Revenue Service had determined to best enforce the laws is a make sure that when someone is prosecuted and punished for a federal tax crime, in this case a felony, that everybody knows about it, and so they have a public affairs office, and the public affairs office makes press releases, and the press releases are intended to tell the people of the United States two things:

No. 1, pay your taxes and be fair with your government, and be fair with your fellow taxpayers, because if you don't, we have this elite group of highly skilled agents out there who are going to catch you and they are going to prosecute you.

And No. 2, the message to the vast majority of honest, hard-working tax-paying American citizens is this: We are making sure that other people are like you. We are making sure ... everyone out there is toeing the line like you and paying your taxes and being fair with Uncle Sam and your neighbor; and so, they write press releases, and they send them out to radio station and to newspapers, and they especially do that in the period right before tax day, April 15th of each year.

Now, the Internal Revenue Service has a problem. The local television news likes to do exciting things. They like sound bites. They like to look at things with agents breaking into houses and pulling out drugs and saving children from wells and so on and so on. The fact that somebody has attempted to evade their federal income taxes does not get their attention; and therefore these press releases have to be made and sent to these

organizations, and a lot of times they don't publish them, but that's what they're doing.

Now, there is a difference, of course, between street crime that goes on television every night and what we euphemistically call "white collar crime," which is what tax evasion is.

Is there anybody here who believes that it is unfair to make a press release about somebody who has evaded or attempted to evade their federal incomes taxes?

(No response)

[Appellants' counsel] Is there anybody who thinks that it should be excused because somebody is high up in the executive suite and they commit a felony, that the public should not know about them; that all the public should know about is the people who are out there dealing drugs or robbing banks; that somehow that is different; that somebody who is high up in an executive suite is entitled to have all of these things squashed quietly, late in the afternoon, far away, using an incorrect address, and in an attempt to use a different name so that nobody can tell that it was really him who was prosecuted.

Anybody believes that? Anybody thinks that would be fair?

This "trophy" saga is a vivid illustration of why this case must be reassigned (and, as discussed *supra*, bears on why it must be retried).

We know that the district judge agrees that an appearance of partiality or bias must be remedied. And, it goes without saying that this reassignment is most extraordinary and ordered most reluctantly. That notwithstanding, our duty is clear.[8]

---

[8] The absolute necessity for impartiality *and* the appearance of same, and our concomitant duty to always attempt to ensure them, regardless of how unpleasant it may be to have a case reassigned, evokes the following passage which incoming new cadets

III.

It is past time for this opinion to end.  It is far past time for this case to end; indeed, to be put to rest.  It has been pending for almost 15 years.  We are confident that through insightful case management and procedures, such as a comprehensive pretrial order and *in limine* and other rulings which otherwise narrow the issues, limiting instructions, and carefully drawn jury instructions, this case can be tried in a manner that is fair to both sides and will result in a correct judgment.

The judgment of the district court is **VACATED** and this matter is **REMANDED** for further proceedings consistent with this opinion. On remand, both § 7217 liability and damages are in issue.  The

---

(plebes) at the United States Military Academy (West Point) were, and it is hoped still are, required to memorize.  A few words may be incorrect or out of order, due to memory dimmed somewhat by the passage of 35 years; nevertheless, the message is crystal clear:

> But an officer on duty knows no one.  To be partial is to dishonor both himself and the object of his ill-advised favor.  What will be thought of him who winks at and overlooks offenses in one, which he causes to be punished in another; and contrast him with the soldier who does his duty faithfully, notwithstanding that it occasionally wars with his private conduct and feelings.  The conduct of one will be emulated and venerated; the other, detested as a satire upon soldiership and honor.

General Douglas MacArthur, one of West Point's, as well as this Nation's, greatest sons, proclaimed, and at the same time cautioned: "There is no substitute for victory".  The same is true of judicial impartiality.  Some things never change; nor should they.  Again, we know the district judge is of this view.

Chief Judge of the United States District Court for the Southern District of Texas is to **REASSIGN** this case.

*VACATED and REMANDED; INSTRUCTIONS ISSUED*